USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: 8-1-18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

DAILY HARVEST, INC.,  :

                                     **Plaintiff,**  :

        -against-  :

IMPERIAL FROZEN FOODS OP CO LLC, A  :
DELAWARE LIMITED LIABILITY COMPANY;  :
HAPPY AND HEALTHY HOLDCO LLC, A  :
DELAWARE LIMITED LIABILITY COMPANY,  :
TODAY'S HARVEST HOLDCO LLC, A NORTH  :
CAROLINA LIMITED LIABILITY COMPANY;  :
AND DOES 1-10,  :

                              **Defendants.**  :

  :

-------------------------------------------------------------------x

1:18-cv-05838 (ALC)

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

      Plaintiff Daily Harvest, a start-up company that sells healthy frozen cup products, brings this action against Imperial Frozen Foods Op Co LLC ("Imperial"), Happy and Healthy Holdco LLC ("Happy Healthy"), and Today's Harvest Holdco LLC ("Today's Harvest") (collectively, "Defendants") alleging breach of contract, fraud, trade secret misappropriation pursuant to 18 U.S.C. § 1836 and New York Common Law, tortious interference with contract, unfair competition in violation of Lanham Act § 43, 15 U.S.C. § 1125, *et seq.* and New York Law, and declaratory judgment. Before the Court is a motion for a preliminary injunction to enjoin Defendants from directly or indirectly marketing, selling, distributing, or advertising Defendants' "Happy Healthy" line of frozen cup smoothie or meal products. ECF No. 27. For the reasons set forth below, Plaintiff's motion is **DENIED**.

1

## BACKGROUND

Plaintiff is a New York City based food start-up founded in 2015 that sells healthy "frozen cup" products, including smoothies and overnight oats, directly to consumers via its website. Am. Compl. ¶ 32, ECF No. 21. Due to increasing sales, Daily Harvest engaged a consulting firm in July 2017 to find a "suitable co-packer that could handle the unique needs and explosive growth Plaintiff was experiencing." *Id*. at ¶ 54. The consulting firm connected Plaintiff with Defendant Imperial, who is "an established supplier of organic frozen fruits and vegetables" and prides "itself as a business that 'integrat[es] our core competencies with your needs' so as to help 'expand' customers' 'frozen fruit and vegetable program[s].'" *Id*. at ¶ 55. Prior to engaging Defendant Imperial as a co-packer, Plaintiff required Defendant Imperial to sign a Non-Disclosure Agreement, "which was purposefully drafted to provide broad protections for Daily Harvest's invaluable confidential information and protection against any unauthorized use or disclosure of its intellectual property." *Id*. at ¶ 56.

In furtherance of their co-packing partnership, Plaintiff allegedly disclosed trade secrets and confidential information to Defendants through June 2018 in both oral and written form. Pl. Mem. Supp. Temporary Restraining Order 7-13, ECF No. 27-1. In March 2018, Defendant Imperial's Vice President of Sales Alex McIntosh provided Plaintiff's Vice President of Product Ricky Silver a courtesy call informing Silver that Defendant Imperial intended to release its own line of frozen smoothie cups in retail stores, but that Imperial had not decided the specifics of the product at that time, i.e., whether it would be sold through one of Imperial's existing brands or through a brand label. Prelim. Inj. Hr'g Tr. 71:23-72:8, July 27, 2018. During the week of June 11, 2018, Plaintiff "was shocked to see a press release advertising Imperial's launch of its own

'Happy Healthy' brand of frozen cup smoothies, overnight oats and bowls, arriving in the market in the Summer of 2018." Pl. Mem. Supp. Temporary Restraining Order 11-12, ECF No. 27-1.

Plaintiff asserts that Defendant Imperial's Happy Healthy line of products imitates Plaintiff's products flavor and ingredient profiles. *Id*. at 13. Plaintiff also alleges that Defendants' trade dress copies "Daily Harvest's trade dress: borrowing its source identifying black lid, white cup with minimal details and directing the consumer's gaze to the central black-and-white initials logo and colorful fruit/ingredient combinations." *Id*.

**DAILY HARVEST**          **HAPPY HEALTHY**



Declaration of Rachel Drori ("Drori Decl.") ¶ 22, ECF No. 28

Defendants' product is set to ship on August 2, 2018, and is expected to hit retail store shelves in late August. Plaintiff seeks to enjoin Defendants' product launch. Prelim. Inj. Hr'g Tr. 86:9-87:4, July 27, 2018.

## LEGAL STANDARD

"The District Court may grant a preliminary injunction if the moving party establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Kind LLC v. Clif Bar &*

3

*Co.*, No. 14 CIV. 770 KMW RLE, 2014 WL 2619817, at *1 (S.D.N.Y. June 12, 2014) (citing

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir.

2012) (internal quotation marks omitted).  In addition, the "court must consider the balance of

hardships between the plaintiff and defendant and issue the injunction only if the balance of

hardships tips in the plaintiff's favor" and "the court must ensure that the public interest would

not be disserved by the issuance of a preliminary injunction." *Id*. (citing *Salinger v. Colting*, 607

F.3d 68, 80 (2d Cir. 2010) (internal quotation marks omitted).

## DISCUSSION

Plaintiff asserts two bases for a preliminary injunction: (1) violation of the NDA; and (2)

trade dress infringement.  During the hearing before the Court on July 27, 2018, the Court held

after considering witness testimony, exhibits, and argument by counsel that Plaintiff did not

sufficiently prove a likelihood of success on the merits on their claim that the NDA was violated

or that the balance of hardships tipped in favor of Plaintiffs and thus, the NDA did not provide a

basis for an injunction.  Prelim. Inj. Hr'g Tr. 117:9-12, July 27, 2018.  The Court now considers

whether Plaintiff's trade dress infringement claim establishes irreparable harm and either a

likelihood of success or that the balance of hardships tip in Plaintiff's favor.

A product's trade dress is its "total image and overall appearance . . . as defined by its

overall composition and design, including size, shape, color, texture, and graphics." *Jeffrey*

*Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995) (internal citations and

quotation marks omitted).  "The Lanham Act protects trade dress that (1) is either inherently

distinctive or has acquired distinctiveness through a secondary meaning and (2) is not functional.

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 743 (2d Cir. 1998) (citing

*Milstein, Inc.*, 58 F.3d at 31).  The plaintiff must prove that its trade dress is distinctive, whereas

4

the defendant can raise the functionality of its trade dress as a defense. *Id.* Moreover, the plaintiff must show "that there is a likelihood of confusion between its trade dress and the allegedly infringing trade dress." *Id.* (citing *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997)).

In sum, "to succeed on a trade dress infringement claim, the plaintiff must show that (1) its trade dress is protectable due to the dress's (a) inherent distinctiveness or (b) acquisition of secondary meaning, and (2) likelihood of consumer confusion." *Kind LLC*, 2014 WL 2619817, at *2 (citing *Nora Beverages, Inc.,* 164 F.3d at 743). Here, the Court finds that Plaintiff has not established a likelihood of success on the merits. The Court also holds that the balance of the hardships tip in favor of Defendants. In light of this, the Court will forgo analysis on whether there is irreparable harm as the existence of irreparable harm by itself is not sufficient for an injunction.

I.      **Likelihood of Success on the Merits**

    *a.  Distinctiveness*

The distinctiveness of a trade dress turns on whether it is "(1) generic, (2) descriptive, (3) suggestive, [or] (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-10 (2d Cir. 1976). Generic trade dresses are entitled to no protection whereas suggestive or arbitrary or fanciful trade dresses are always inherently distinctive. *Id.* A descriptive trade dress, on the other hand, can be distinctive and protectable if the producer establishes that it has acquired a secondary meaning, i.e., the trade dress has become associated with the producer rather than the product itself. *Id.*; *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991) ("The trade dress of a product attains secondary meaning

5

when the purchasing public 'associates' its design with a single producer or source rather than simply with the product itself.")

"[A] party seeking to prove secondary meaning has a heavy burden . . . ." *20th Century Wear, Inc. v. Sanmark–Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir. 1987) (internal quotation marks omitted). Courts consider the six factors when assessing whether a trade dress has acquired a secondary meaning in the minds of consumers; no single factor is determinative and not all factors need to be proven: "(1) advertising expenditures, (2) consumer studies linking the dress to the source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the dress, and (6) length and exclusivity of the [dress]'s use." *L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.*, 79 F.3d 258, 263 (2d Cir. 1996) (internal quotation marks omitted).

Ultimately, "an inherently distinctive trade dress is one whose 'intrinsic nature serves to identify a particular source of a product,' although it may not yet have widespread identification among consumers." *Fun–Damental Too, Ltd.*, 111 F.3d at 1000 (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). The focus of the distinctiveness inquiry is not necessarily to assess whether each element of a trade dress is inherently distinctive, but rather whether the "combination of elements" is distinctive. *Jeffrey Milstein, Inc.*, 58 F.3d at 32. If "a trade dress is composed exclusively of commonly used or functional elements," however, it "might suggest that that dress should be regarded as unprotectable . . . to avoid tying up a product or marketing idea." *Id.*

District courts must bear in mind two considerations when evaluating claims of distinctive trade dress: (1) the "overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas;"

and, (2) trade dress law does not "protect an idea, a concept, or a generalized type of appearance," but only their "concrete expression." *Id*. In light of the law and these considerations, the Court finds that Plaintiff's trade dress is not distinctive so as to warrant protection under the law.

Plaintiffs assert that their trade dress—a "black lid[ded], white cup with minimal details . . . [with a] central black-and-white initials logo and colorful fruit/ingredient combinations"—is source identifying. Pl. Mem. Supp. Temporary Restraining Order 13, ECF No. 27-1. Defendants on the other hand argue that the combination of the elements are generic and not source identifying. Defs. Opp. Temporary Restraining Order 5-6, ECF No. 25. The Court disagrees with both parties and finds that Plaintiff's trade dress is descriptive, but lacks secondary meaning.

A trade dress is likely to be generic "where it is the custom in a particular industry to package products in a similar manner . . . ." *Mana Prod., Inc. v. Columbia Cosmetics Mfg*., Inc., 65 F.3d 1063, 1069–70 (2d Cir. 1995). Here, there is not sufficient evidence to verify whether a black-lidded white cup for frozen smoothies is the industry standard in a relatively new product category. Parties have identified several examples of competing frozen cup products, which come in white cups with black lids[1]; white cups with white lids[2]; and black cups with black lids.[3] As the only similarity between these products' trade dress is the use of a lidded cup, Plaintiff's trade dress, which includes certain aesthetic choices and its logo, cannot be considered generic.

But, Plaintiff's black-lidded white cups with colorful fruits are also not source identifying in spite of their features that keep them from being generic. Plaintiff does not argue that its trade

---

[1] Blix, https://myblix.com/cups (last visited July 30, 2018).
[2] Project Juice, https://subzerosuperfoods.com (last visited July 30, 2018).
[3] BIY Juice Generation, https://blendityourself.com/menu/all (last visited July 30, 2018).

dress is suggestive, arbitrary or fanciful, nor can it. Plaintiff instead attempts to argue that its

trade dress is distinctive because it has derived secondary meaning for two reasons. First,

Plaintiff asserts that consumers associate Plaintiff's trade dress with Plaintiff's "clean,

uncomplicated, and transparent" brand; and second, Defendants' alleged willful copying of

Plaintiff's is strong evidence of secondary meaning. Pl. Mem. Supp. Temporary Restraining

Order 22, ECF No. 27-1; Declaration of Ricky Silver ("Silver Decl.") ¶ 3, ECF No. 30.

The Court finds that Plaintiff's trade dress is descriptive as the elements it "seeks to

protect here all describe its product." *Kind LLC*, 2014 WL 2619817, at *3 (citing *Med. Econ.*

*Co., Inc. v. Prescribing Reference, Inc.*, 294 F.Supp.2d 456, 463 (S.D.N.Y. 2003)). Plaintiff's

claims as to secondary meaning, however, are conclusory at best and do not meet the heavy

burden required to prove a trade dress has acquired secondary meaning. Here, there is no

evidence, statistical or otherwise, indicating whether consumers associate Plaintiff's trade dress

with Plaintiff's brand. And there is also no evidence, at this time, that Defendant willfully

copied Plaintiff's trade dress.[4] *Cf. Kind LLC*, 2014 WL 2619817 (internal documents revealed

that the defendant Cliff Bar "deliberately copied elements of the KIND trade dress for its new

MOJO trade dress"). Furthermore, Plaintiff "fails to establish that its sales, marketing and

advertising expenditures, and unsolicited media coverage have resulted in consumers

associating" its trade dress with Plaintiff. *Id*. 2014 WL 2619817, at *5. Absent such a showing,

Plaintiff's claim lacks merit. Accordingly, Plaintiff's trade dress is not distinctive and

correspondingly, not protectable.

---

[4] Defendants argued during the July 27, 2018 hearing that their use of a black lid was purely functional.
Specifically, a black lid would prevent the lid from showing any dirt, which could result when the cups are stacked
on top of one another in retail stores. Prelim. Inj. Hr'g Tr. 32:13-23, July 27, 2018. The Court does not take a
position at this time on whether this proves that Defendants' choice of trade dress was purely functional, but this
would be a viable defense to Plaintiff's claim. *See Nora Beverages, Inc.*, 164 F.3d at 743.

b.   *Confusion*

To determine whether there is a likelihood of consumer confusion, courts consider eight factors outlined in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961): "(1) the strength of the plaintiff's trade dress, (2) the similarity between the two trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant's bad faith, (7) the quality of defendant's product, and (8) the sophistication of the relevant consumer group." *Fun–Damental Too, Ltd.*, 111 F.3d at 1002–03.  No single factor is dispositive and the factors are not exclusive.  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).  Based on the evidence before the Court at this time, the *Polaroid* factors weigh slightly in favor of Defendants.

### 1. Strength of Plaintiff's Trade Dress

When assessing the strength of Plaintiff's trade dress, courts consider (a) the classification of the trade dress on the *Abercrombie* spectrum, (b) secondary meaning, and (c) "the tendency of the trade dress to identify the goods sold as emanating from a particular source, even when the source is unknown to the consumer." *Fun–Damental Too, Ltd.*, 111 F.3d at 1003 (citing *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1225 (2d Cir. 1987)). Put succinctly, "the essence of the analysis is to determine the strength of the trade dress in its commercial context." *Id*.  This factor weighs in favor of Defendant as explained by the analysis above.  Plaintiff's trade dress is not distinctive, has not been shown to have acquired secondary meaning, and there is no evidence indicating that the trade dress identifies Plaintiff as the source.

2. <u>Similarity Between Trade Dresses</u>

Similarity requires an assessment of whether two products "create the same general overall impression." *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979). "Under this part of the inquiry, the court considers the products' sizes, logos, typefaces, and package designs to determine where the similarity of the marks is likely to provoke confusion among potential consumers." *Paco Sport, Ltd. v. Paco Rabanne Perfumes*, No. 00-7344, 2000 WL 1721126 at *4 (2d Cir. Nov. 16, 2000) (citing *W.W.W. Pharm. Co. v. The Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993)) (citing *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1133 (2d Cir. 1979)). But, "courts must evaluate the likely effect on consumers of the marks' similar and dissimilar features with a *focus on market conditions*, even if the products appear to be adequately different in a non-marketplace setting." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 539 (2d Cir. 2005) (emphasis in original). Where products are not sold side-by-side, a sequential rather than a simultaneous comparison is legally appropriate. *Id.* Under a sequential analysis "a district court must ask not whether differences are easily discernable on simultaneous viewing, but whether they are likely to be *memorable enough to dispel confusion* on serial viewing." *Id.* at 538 (emphasis added).

Here, Defendants argue that "[i]t is of great importance . . . that one recognize that Defendants' product was designed to be a retail brand while Plaintiff's product was designed to be a direct-to-consumer brand" and that the products "will not be displayed side-by-side in the marketplace." Defs. Opp. Temporary Restraining Order 9, ECF No. 25. Defendant is correct, but this leads to a finding in favor of Plaintiff under this *Polaroid* factor. As discussed above, Plaintiff mark is weak and lacks distinctiveness. Defendants' mark also lacks distinctiveness, and indeed Defendants argue that a white cup and black lid are functional rather than distinctive.

Prelim. Inj. Hr'g Tr. 32:13-23, July 27, 2018.  Though neither trade dress is generic, neither has features that would be memorable enough to dispel consumer confusion upon a serial viewing. Upon a simultaneous viewing there are easily discernable differences: Defendants' cup is larger, has a circular logo with a different brand name, and uses a different typeface that is larger and thicker.  When considered sequentially, however, the surface level similarities, i.e., a black-lidded white cup with colorful fruits, are the features likely to be remembered by consumers. This suggests that the marks are similar and thus, there is a likelihood of confusion.

### 3. Proximity of the Products

The proximity inquiry asks to what extent the two products compete with each other. *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004) (citing *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)). Defendants argue that their product occupies a different channel (retail stores) than Plaintiff's product (online only); Plaintiff asserts that this distinction is not reasonable in 2018.  The Court finds that this factor weighs in favor of Defendants, though only slightly.  In *New Look Party Ltd. v. Louise Paris Ltd.*, No. 11 CIV. 6433 NRB, 2012 WL 251976, at *7 (S.D.N.Y. Jan. 11, 2012), the court found that the fact that plaintiff, unlike defendant, was an online only retailer in the United States "weigh[ed] heavily against a finding of likelihood of confusion."  The court noted the "significant difference" between a purchase "made in a physical store with no practical impediments to returning goods" versus "a purchase made over the internet . . . where a return requires payment of additional shipping fees."  *Id*.  Though Plaintiff argues that the distinction between brick-and-mortar stores and the internet has eroded, the Court has no reasoned basis from which to draw this conclusion.  Without more information regarding consumer behavior and perception, the

Court defaults to the reasoning in *New Look Party Ltd.* and finds that the products at issue do not occupy the same commercial channel at this time, weighing against a likelihood of confusion.

### 4. Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (citing *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 963 (2d Cir. 1996)). Here, Plaintiff has asserted that it intends to expand its business into retail stores, but at this time those plans are speculative. Therefore, this factor weighs in favor of Defendants. Prelim. Inj. Hr'g Tr. 27:6-10, July 27, 2018.

### 5. Actual Confusion

Evidence of actual confusion is not necessary to show likelihood of confusion. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988). When considering actual confusion, however, courts have found that "a 15% net confusion rate may be sufficient to show actual confusion . . . ." *Kind LLC*, 2014 WL 2619817, at *9 (collecting cases). Here, Plaintiff's expert David W. Stewart, a Professor of Marketing and Business at Loyola Marymount University, has identified a net confusion rate of 22.94% for Defendants' product. Second Supplemental Declaration of David W. Stewart ("Supplemental Stewart Decl.") 2, ECF No. 39. To assess confusion, Stewart applied the "Squirt" method, which first asks pre-screened survey participants to review Plaintiff's brand packaging, and then, on a separate webpage, randomly displays either Defendants' brand packaging or one of the three controls' brand packaging before asking participants "whether the products were made by, affiliated with and/or otherwise endorsed by Plaintiff." Declaration of David W. Stewart ¶¶ 14-25.

Defendants do not provide statistical evidence of their own to counter Stewart's study, but instead argue that the methodology Stewart employed to assess confusion is inappropriate for products that will not proximately appear in the market.  Defs.'s Letter Response to Supplemental Stewart Decl. 1, ECF No. 40.  Defendants cite *Isle of Capri Casinos, Inc. v. Flynt*, No. 216CV06148CASMRWX, 2016 WL 6495380, at *7 (C.D. Cal. Nov. 1, 2016), which discounted Stewart's squirt survey because "it did not replicate marketplace conditions" where "the parties' compete in a service industry across great distances" so consumers would not "ordinarily encounter" one after another as they did in the survey.  As Stewart was not available for testimony or cross-examination regarding his survey methodology, the Court does not find itself in a position to decide whether the survey methodology is valid given the circumstances of this case.[5]  In light of this and a lack of expert testimony proffered by Defendants, the Court finds that Plaintiffs have shown that there is some degree of actual confusion, though exactly how much is unclear.  Accordingly, this factor weighs in favor of Plaintiff.

### 6. Defendants' Bad Faith

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Id.* at 388.  At this time, Plaintiff has not provided actual evidence to prove that Defendants are attempting to exploit the good will and reputation of Plaintiff.  Though Plaintiff believes this to be the case and asks the Court to infer as much, without more, the Court finds that this factor weighs in favor of Defendant.

---

[5] The cases Plaintiff cite that relied on Stewart's surveys provide little guidance.  In *Cacique, Inc. v. Reynaldo's Mexican Food Co.*, LLC, No. 2:13-CV-1018-ODW, 2014 WL 537061, at *4 (C.D. Cal. Feb. 10, 2014), the court relied on Stewart's expert analysis on "sales data and information on Cacique's advertising and marketing," which does not appear to be the same type of analysis before the Court in this case.  In *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 903 (9th Cir. 2002), the Ninth Circuit analyzed Stewart's methodology in the context of a motion for summary judgment, which requires drawing all justifiable inferences in favor of plaintiff.  That is not the standard when assessing whether a plaintiff is entitled to preliminary injunction.

7. <u>Quality of Defendants' Product</u>

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *The Sports Auth., Inc.*, 89 F.3d at 965 (internal citation and quotation omitted). The Court lacks relevant information regarding the quality of the products, and therefore will not consider this factor.

8. <u>Relevant Consumer Sophistication</u>

When analyzing this factor, courts "consider the general impression of the ordinary consumer, buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue." *Streetwise Maps, Inc.*, 159 F.3d at 746. "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992). Here, the parties did not provide any statistical evidence or argument in connection with this factor. In light of this, any analysis by the Court of whether consumer sophistication vitiates the likelihood of confusion would be conjectural.

**II.    Balance of the Hardships**

Though Plaintiff has not shown a likelihood of success on the merits, the Court can still grant a preliminary injunction if Plaintiff can establish "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (citing *UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011). The Court holds that, as the facts currently stand, the balance of the hardships favor the Defendants.

14

Here, Defendants have prepared their products for shipment, with the intent of being placed on the shelves of various retail stores by August 20, 2018.  Prelim. Inj. Hr'g Tr. 86:9-87:4, July 27, 2018.  Defendants note that should an injunction be granted, Defendants would lose $5,000,000 in product sales, $2,000,000 in out-of-pocket losses related to packaging and other raw materials, and its good will with the retailers with whom Defendants have made commitments.  Aff. of Kevin Migdal ("Migdal Aff") ¶¶ 24-25, ECF No. 25-8.  Defendants explained that securing shelf space with retailers for a new product is a "significant process" that took several months in this case, and that one "hiccup could have a catastrophic effect and a domino effect where the relationship is tarnished . . . [and] we could lose our own shelf space on our existing products."  Prelim. Inj. Hr'g Tr. 63:9-66:4, July 27, 2018.  Defendants noted that losing shelf space for their existing products could result in approximately $3,000,000 in lost sales for the remainder of this year.  *Id.* at ¶¶ 27-28.

Plaintiff counters that Defendants' "products are frozen and can be stored without perishing for significant periods of time," that Defendants' product launch would harm Plaintiff's reputation and brand strength if Defendants' product is of lower quality, and that the proverbial genie cannot be put back in the bottle.  Pl. Mem. Supp. Temporary Restraining Order 24-25, ECF No. 27-1; Drori Decl. ¶¶ 26-28.  Considering that the harms espoused by Plaintiff are less tangible and more speculative, especially in light of Plaintiff's failure to establish likelihood of confusion, the Court finds that the balance of the hardships tip in favor of Defendants.  As such, an injunction is inappropriate at this time.

## CONCLUSION

For all of the above-stated reasons, Plaintiff's application for a preliminary injunction is

**DENIED**.


**SO ORDERED.**


**Dated:** July 31, 2018
        New York, New York

_____
ANDREW L. CARTER, JR.
United States District Judge